KANSAS NATURAL GAS CO. v. HASKELL et al.

(Circuit Court. E. D. Oklahoma. July 3, 1909.)

Nos. 856–859.

1. COURTS (§ 303*)—JURISDICTION OF FEDERAL COURTS—"SUIT AGAINST THE STATE."

A suit to enjoin individual defendants from proceeding as officers of a state to enforce an act of the Legislature of such state which is unconstitutional and void is not a "suit against the state" within the meaning

---

of the eleventh amendment to the Constitution, and is within the jurisdiction of a federal court.

[Ed. Note.—For other cases, see Courts, Cent.Dig. § 844½; Dec.Dig. § 303.*
For other definitions, see Words and Phrases, vol. 7, p. 6778; vol. 8, p. 7809.
Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

**2.** CONSTITUTIONAL LAW (§ 47*)—VALIDITY OF STATE STATUTE—DETERMINATION—SCOPE OF INQUIRY.

In determining whether a state statute is within the powers of the state, a court will look beyond the title of the act, to ascertain its real purpose and effect from an examination of the body thereof.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43–45; Dec. Dig. § 47.*]

**3.** MINES AND MINERALS (§ 48*) — CONSTITUTIONAL LAW (§§ 206, 240, 277*) — EMINENT DOMAIN (§ 87*)—NATURAL GAS—NATURE OF PROPERTY—POWERS OF STATE.

Natural gas found within the territorial limits of a state is not a product which the state may conserve and preserve by law as a thing in which the people of the state have a common interest, as flowing streams, wild animals, etc.; but one who by lawful right reduces it to possession has the absolute right of property therein, with the right to transport and sell and deliver the same as other personal property, of which right he cannot be deprived by the state without just compensation, without violation of the fourteenth amendment to the federal Constitution, and also, in Oklahoma, of article 12, § 24, of the state Constitution.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 48;* Constitutional Law, Dec. Dig. §§ 206, 240, 277;* Eminent Domain, Dec. Dig. § 87.*]

**4.** COMMERCE (§ 33*) — EMINENT DOMAIN (§ 2*) — INTERSTATE COMMERCE — ATTEMPTED PROHIBITION BY STATE.

Acts Okl. 1907, p. 586, c. 67, which prohibits, except for private use, the construction of pipe lines for the transportation of natural gas within the state, except by corporations organized thereunder by charters providing that such gas shall not be transported out of the state, nor sold or delivered to any one else to be taken out of the state, is void as an attempt to interfere with interstate commerce, in violation of the commerce clause of the federal Constitution, and, as applied to owners of gas wells in the state, as in violation of article 12, § 24, of the state Constitution, providing that private property shall not be taken without just compensation.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 33;* Eminent Domain, Dec. Dig. § 2.*]

**5.** HIGHWAYS (§§ 80, 89*)—TITLE TO FEE AND RIGHTS OF ABUTTING OWNERS—USE OF HIGHWAY BY ABUTTING OWNER FOR OTHER PURPOSES.

The fee to the land comprising rural highways in the portion of Oklahoma which was formerly Indian Territory is not vested in the state, but in the abutting landowners, subject only to an easement in the public to use the same for highway purposes; and the state has no power to prohibit the laying and maintaining of pipe lines over or across such highways, by contract with such owners, for the transportation of natural gas from within to without the state in interstate commerce, where it does not interfere with the easement in the public, and subject to such reasonable rules and regulations as the state may impose in the interest of the public health and safety.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 288–299; Dec. Dig. §§ 80, 89.*]

In Equity. On motions for preliminary injunctions and demurrers to bills. Bills by the Marnet Mining Company, by A. W. Lewis, and

by O. A. Bleakley against the same defendants are also governed by the opinion reported herewith.

E. L. Scarritt, Eugene Mackey, John J. Jones, J. P. O'Meara, Zevely, Givens & Smith, and Edward W. Hatch, for complainants.

Charles West, Atty. Gen., and Flynn, Ames & Chambers, for respondents.

POLLOCK and CAMPBELL, District Judges. The scope of each of the foregoing bills being identical, and the object and purpose sought to be accomplished thereby being the same, the cases will be considered together, as they have been argued, briefed, and submitted for decision in that manner. The facts necessary to a decision of the questions involved may be stated, as follows:

At its regular 1907 session the Legislature of this state passed an act, the same being chapter 67, p. 586, of the Laws for the Year 1907, which provides as follows:

"Chapter 67.

"Pipe Lines.   Regulating Gas and Oil Pipe Lines.

"Article 1.

"An act regulating the laying, constructing, and maintaining and operating of gas pipe lines for the transportation of natural gas within the state of Oklahoma, defining the modes of procedure for the exercise of the right of eminent domain for such purposes, providing for the inspection and supervision of the laying of such pipe lines and limiting the gas pressure therein, and providing penalties for the violation thereof.

"Be it enacted by the people of the state of Oklahoma:

"Section 1. Any firm, copartnership, association or combination of individuals may become a body corporate under the laws of this state for the purpose of producing, transmitting, or transporting natural gas to points within this state by complying with the general corporation laws of the state of Oklahoma, and with this act.

"Sec. 2. No corporation organized for the purpose of, or engaged in the transportation or transmission of natural gas within this state shall be granted a charter or right of eminent domain, or right to use the highways of this state unless it shall be expressly stipulated in such charter that it shall only transport or transmit natural gas through its pipe lines to points within this state; that it shall not connect with, transport to, or deliver natural gas to individuals, associations, copartnerships, companies or corporations engaged in transporting or furnishing natural gas to points, places, or persons outside of this state.

"Sec. 3. Foreign corporations formed for the purpose of, or engaged in the business of transporting or transmitting natural gas by means of pipe lines, shall never be licensed or permitted to conduct such business within this state.

"Sec. 4. No association, combination, copartnership or corporation shall have or exercise the right of eminent domain within this state for the purpose of constructing, or maintaining a gas pipe line or lines within this state, or shall be permitted to take private or public property for their use within this state, unless expressly granted such power in accordance with this act.

"Sec. 5. The laying, constructing, building and maintaining a gas pipe line or lines for the transportation or transmission of natural gas along, over, under, across or through the highways, roads, bridges, streets, or alleys in this state, or of any county, city, municipal corporation or any other public or private premises within this state is hereby declared an additional burden upon said highway, bridge, road, street, or alley, and any other private, or public premises may only be done when the right is granted by express charter from the state and shall not be constructed, maintained, or operated until all damages to adjacent owners are ascertained and paid as provided by law.

"Sec. 6. All pipe lines for the transportation or transmission of natural gas in this state shall be laid under the direction and inspection of proper persons skilled in such business to be designated by the chief mining inspector for such duty, and the expenses of such inspection and supervision shall be borne and paid for by the parties laying and constructing such pipe lines for the transportation or transmission of natural gas.

"Sec. 7. No pipe line for the transportation or transmission of natural gas shall be subjected to a greater pressure than three hundred pounds to the square inch, except for the purpose of testing such lines, and gas pumps shall not be used on any gas pipe lines for the transportation or transmission of natural gas or used on or in any gas well within this state.

"Sec. 8. Any corporation granted the right under the provisions of this act to exercise the right of eminent domain, or use the highways of this state to construct or maintain a gas pipe line or lines for the transportation or transmission of natural gas to points within this state, which shall transport or transmit any natural gas to a point outside of, or beyond this state, or shall connect with or attempt to connect with or threaten to connect with any gas pipe line furnishing, transporting, or transmitting gas to a point outside of, or beyond this state, shall by each or all of said acts, forfeit all right granted it or them by the charter from this state, and said forfeiture shall extend back to the time of the commission of said act or said acts in violation of this Act; and such act or acts shall of themselves work a forfeiture of any and all rights of any and every kind and character which may be or may have been granted by the state for the transportation or transmission of natural gas within this state, and all the property of said corporation and all the property at any time belonging to said corporation, at any time used in the construction, maintaining or operation of said gas pipe line or lines shall, in due course of law, be forfeited to and be taken into the possession of the state through its proper officer and in said action there shall be a right to the state of the appointment of a receiver, either before or after the judgment, to be exercised at the option of the state, and the officer taking possession of said property shall immediately disconnect said pipe line or lines at a proper point in this state from any pipe line or lines going out of, or beyond the state. And said property shall be sold as directed by the court having jurisdiction of said proceedings, and the proceeds of said sale shall be applied, first to the payment of the cost of such proceeding, and the remainder, if any, paid into the school fund of the state, and said charter under which said act or acts were committed shall be revoked, and no charter for the transportation or transmission of natural gas shall ever be granted to any corporation having among its stockholders any person who was one of the stockholders of said corporation, whose charter has or may have been forfeited as aforesaid, and if any such charter shall have been granted, and thereafter a person shall become a stockholder thereof who was one of the stockholders of the corporation whose charter has been or may have been forfeited, as herein provided, the charter of said corporation, one of whose stockholders is as last named, shall therefore be forfeited and revoked: Provided, that any person who may be denied the right to become a stockholder as above prescribed may be granted the right to become such stockholder by the corporation commission, when such person shows to such commission that he was not a party to the former violation of this act.

"Sec. 9. No pipe lines for the transportation or transmission of natural gas shall be laid upon private or public property when the purpose of such line is to transport or transmit gas for sale to the public until the same is properly inspected as provided in this act; and before any gas pipe line company shall furnish or sell gas to the public, it shall secure from the inspector a certificate showing that said line is laid and constructed in accordance with this act, and under the inspection of the proper officers, provided, that nothing in this act shall be construed to prevent persons drilling for oil and gas from laying surface lines to transport or transmit gas to wells which are being drilled within this state and further provided, that factories in this state may transport or transmit gas through pipe lines for their own use for factories located wholly within this state, upon securing the right of way from the state over or along the highways and from property owners to their lands.

"Sec. 10. That no person, firm or association or corporation shall ever be permitted to transmit or transport natural gas by pipe lines in this state or in this state construct, operate a pipe line for the transmission of natural gas, except such persons, firms, associations, or corporations be incorporated as in this act provided, except as in section 9 of this act, and provided further that all persons, firms, corporations, associations and institutions now doing the business of transporting or transmission of natural gas in this state and otherwise complying with this act are hereby permitted to incorporate under the provisions of this act within ten days after the passage and approval of the same.

"Sec. 11. All acts and parts of acts in conflict with this act are hereby repealed.

"Sec. 12. An existing emergency is hereby declared by the Legislature for the preservation of the public peace, health and safety of the state.

"Sec. 13. This act shall take effect from and after its passage and approval as provided by law.

"Approved December 21, 1907."

The several bills presented in the above entitled and numbered cases call in question the constitutional validity of the foregoing enactment. The status and interest of the several complainants in the subject-matter of this litigation, as averred in the bills of complaint, may be briefly stated as follows:

The Kansas Natural Gas Company, complainant in case No. 856, is, and was at the date of the commencement of that suit, a corporate citizen of the state of Delaware. Its business is that of purchasing and distributing natural gas to consumers. It is in the market for, and is willing to buy and receive, large quantities of natural gas for transportation by it to the several cities of Kansas and Missouri along its trunk pipe line, and supplied by it with natural gas there to be distributed, sold, and used. It has a contract for the purchase of all the gas that can be produced from a certain well located in Washington county, this state, and has acquired by purchase a right of way over and across the land upon which said well is situated for the laying of a pipe line for the transportation of said gas. It proposes to, and if permitted to so do will, extend its present trunk pipe line from the present southern terminus thereof in the state of Kansas southward across the state line into the state to receive gas which it has a right to receive under its said contract. It also proposes to build and construct lateral and branch lines from said main trunk line so extended for the purpose of gathering and receiving such gas as it may be able to purchase from the owners of other wells in the state. Said line will be used by it for the transportation of natural gas from wells in the state into the states of Kansas and Missouri, and not in any way for local traffic in the state. The cost of constructing its proposed pipe lines will be more than $100,000.

The Marnet Mining Company, complainant in case No. 857, is, and was at the date of the commencement of that suit, a corporate citizen of the state of West Virginia. For the purpose of transporting natural gas from the owners and producers thereof in the state to purchasers and consumers thereof in the states of Kansas and Missouri, it has purchased a right of way over certain lands in this state, and proposes to build and construct a system of pipe lines from the states of Kansas and Missouri into this state, to be used exclusively for in-

terstate transportation of natural gas, and not in any way for local traffic in the state. Upon the completion of said pipe line, it will be in the market for, and will be willing to buy and receive, large quantities of natural gas, to be delivered at the wells in this state, and thence transported by it through said pipe lines out of the state, and into the states of Kansas and Missouri, for sale, distribution, and use in those states.

A. W. Lewis, complainant in case No. 858, is, and was at the date of the commencement of said suit, a citizen and resident of the state of Ohio. He is the owner of an oil and gas lease made to him by one Stephen B. Tehee on the 12th day of May, 1905, by the terms of which he has acquired the right to construct wells on a certain tract ot land in this state belonging to said Tehee, and to take therefrom all the gas which can be produced from said premises for a period of 15 years from the date of said contract. Agreeable to the terms of said contract, complainant at a cost of many thousand dollars drilled and constructed a well upon said land capable of producing many millions of cubic feet of gas per day. Because of the supply of gas in this state being in excess of the local demand, he is unable to sell, market, or dispose of the same in this state, and, being prevented from transporting said gas from the state, he has suffered great loss and damage in being deprived of his property without compensation.

O. A. Bleakley, complainant in case No. 859, is a citizen and resident of the state of Pennsylvania, and was at the date of the commencement of that suit. For the purpose of constructing a pipe line for transportation of natural gas from certain points in this state into the state of Kansas, he applied to the honorable Secretary of the Interior for a right of way over the lands of certain Indians in Washington county, in this state, through which said proposed pipe line will run, and on the 2d day of June, 1908, the honorable Secretary of the Interior of the United States, by virtue of the power vested in him, did grant unto complainant the right of way across said Indian lands along and over a certain designated route. This right of way was granted to complainant on condition that he should, in accordance with the laws of the United States and the rules and regulations of the Interior Department, pay to the Indian agent the value of such right of way, the damages which the several owners of land over which the same would pass would sustain from laying, building, and maintaining said line. In compliance with said condition and requirement he paid to the Indian agent at Muscogee the sum required to be paid, said sum being the full and fair amount of such right of way and the full and fair amount of such damages. The complainant proposes to build and construct a pipe line on the right of way so obtained, for the exclusive purpose of transporting natural gas from this state into the state of Kansas, not in any way for local traffic in this state.

The several bills further disclose under a large area of this state natural gas exists in abundance; that a large number of wells have been drilled at great expense and capable of producing more than 1,000,000,000 cubic feet of natural gas per day; that this amount is

much more than is required to meet all the demands of the people of the state; that this excess of supply is required to meet the wants of those residing without the state, in the states of Kansas and Missouri; and while such want may be supplied through distributing plants now constructed and those contemplated by complainants, and the excess product may be there disposed of at a fair profit by the owners, under present conditions the owners are required to cease development work, to keep large and valuable wells capped and inoperative, to their great injury and damage. It is further disclosed by the several bills the gas owned by complainants for the most part is produced from lands owned by Indians under leases executed by them with the approval of the Secretary of the Interior before the admission of this state into the Union. It is further averred in the bills the sole object and purpose of complainants is to engage in the marketing and transportation of natural gas beyond the confines of the state only, and not to engage in the performance of any public service in this state; that in constructing lines for such transportation it will not be necessary to carry them along and upon the public highways of the state, but only to cross under or over the same; that such pipe lines so to be constructed are private lines, to be safely and properly constructed and laid by virtue of private contracts with the owners of the land in such manner as to endanger the lives, health, and property of no one, and in just conformity to any and all reasonable rules and regulations of the state for the safety and health of the citizens of said state. The several bills further aver each of the defendants, by virtue of his office and the Constitution and laws of the state of Oklahoma, is clothed with some power and authority and charged with the performance of some duty in the execution and enforcement of the laws of the state and in the protection of public rights, and particularly in respect to the execution and enforcement of the provisions of chapter 67 of the Session Laws of the State for the Year 1907, above set forth, and that as such officers, or otherwise, they have assumed and undertaken to execute and enforce said act by both actions and proceedings in the courts of the state and by force of arms; that it is the avowed object, purpose, and intent of the defendants to the several bills, and each and every of them, to prevent the transportation of natural gas produced in this state beyond the limits of the state, and to that end they are charged with the commission of the following acts:

(1) They caused to be passed by the Legislature of the state the act above set forth. It is further charged said act was passed solely for the purpose of preventing the transportation of natural gas beyond the borders of the state; that said act is wholly illegal and void, because in contravention of certain designated articles of the Constitution of the United States and of this state. (2) That with force and violence, against the rights of the owners thereof, and in violation of the Constitution of the United States and of this state, defendants seized a gas pipe line in course of construction across the line dividing the state of Kansas and this state, and which was to be used wholly and solely for interstate carriage and transportation of gas, tore the same up, and threw the gas pipe and materials of which it was

being constructed back upon the Kansas side of the state line. (3). Defendants caused the line dividing the state of Kansas and this state to be patrolled on the Oklahoma side thereof with armed guards, ordered and instructed by defendants to resist by force and arms the laying and building of any gas pipe line across said line, and to prevent with force and violence the building of any such line, and, if necessary to that end, to tear up and destroy the same. (4) That defendants have, assuming to act in pursuance of the authority granted by the foregoing act, taken possession of all pipe lines engaged in the interstate transportation of natural gas from this state into adjoining states, by force and violence or through receiverships in legal proceedings in the local courts of the state, the sole object and purpose of which was to effectually prohibit and prevent the transportation of natural gas from out this state; that defendants threaten, and it is their purpose, to tear up and destroy by force and violence any gas pipe line transporting natural gas from out this state, and to prevent by force, violence, and by trespass upon the complainants' property and rights, the construction and operation of any pipe line constructed by complainants.

The prayers of the several bills of complaint are as follows: (1) For discovery; (2) that chapter 67, Laws 1907, set forth in the bills, may be declared illegal and void, because in conflict with section 8, art. 1, and the fourteenth amendment to our national Constitution; also illegal and void as offending against the provisions of section 57, art. 5, and sections 24 and 32, art. 2, of the Constitution of the state; (3) that defendants, each and all of them, their agents, servants, and employés, may be perpetually enjoined and restrained from tearing up, destroying, or in any way interfering with the laying, building, or construction of natural gas pipe lines by complainants for the purpose disclosed in the bills of complaint, and from bringing or maintaining in the courts of the state any suits or actions under the provisions of the statute above set forth, or any other law, to restrain complainants from constructing, maintaining, and operating any such pipe line, or to restrain complainants from transporting natural gas from out the state; (4) a temporary or provisional injunction of like effect and purpose pendente lite; (5) other and general equitable relief.

Against these several bills, defendants, each and all, have lodged demurrers, which were presented in oral argument and now stand submitted for decision on elaborate briefs filed by the solicitors for the respective parties, together with application on the part of complainants for provisional injunctions pendente lite. In support of the demurrers interposed, defendants contend, as follows: (1) That these suits, while in name against defendants, occupying official positions under the Constitution and laws of the state, are in truth and in fact against the state of Oklahoma in its sovereign capacity; hence are in contravention of the eleventh amendment to the Constitution. (2) That the act above set forth is a lawful exercise of the legislative power of the state in controlling, safeguarding and protecting the use and enjoyment of the public highways of the state, the organization

of corporate citizens of the state, and the conferring thereon corporate powers, in regulating the laying of natural gas pipe lines, providing for the inspection of such lines, and other matters, all within the legislative power of the state. (3) That the act is valid, because passed by the Legislature in a lawful exercise of the police power of the state, in preserving and protecting from waste the natural resources of the state. (4) It is contended, if the law be unconstitutional, complainants have not by their bills shown such interest in the subject-matter of the litigation as will enable them in challenge the validity of the enactment.

In support of the bills it is the insistence of complainants: (1) Regardless of the form of the act and its declared purpose, as expressed in the title, the manifest, dominant object and purpose sought to be accomplished thereby is to prevent the transportation of natural gas from out the state into other states. That the courts will look beyond the mere declaration of purpose stated in the title of the act to find its true intent and purpose, and, such true intent and purpose being found to be to prohibit or regulate commerce among the states, the act will be declared void because in violation of the commerce clause of the Constitution. (2) That a state has no such public interest in natural gas found within its territorial limits as will authorize it to prevent its transportation in interstate commerce, but that the owner of the soil, or the lessee of natural gas rights in the land from the owner, has a vested private property right in the gas found therein, which, when reduced to possession, is a purely private right of ownership, with full power of sale, disposition, and transportation under proper safeguards, which private property rights of the individual cannot be taken away, destroyed, or unduly restricted by the state without just compensation be made to the owner. And as the act in question attempts to take away, destroy, or render less valuable such private property rights of complainants, without compensation, it is in violation of the fourteenth amendment to the national Constitution, and section 24, art. 2, of the Constitution of the state. (3) That the fee of the public highways of the state is by law vested in the abutting landowners, and not in the state, as contended by defendants. That the public have a right of easement in the highways only. Therefore complainants, while conceding they may not forcibly obtain a right of way for their pipe lines, save by the exercise of the sovereign power of eminent domain, which the state may lawfully refuse to grant them, yet they assert they have the lawful right to procure such right of way by private contract and purchase from the owners, and for such purpose no franchise from the state and no right to exercise the power of eminent domain granted by the state is necessary. (4) The said act is in contravention of the Constitution of the state, because it contains more than one subject, not clearly expressed in its title. (5) Because it attempts to create monopolies, grant exclusive privileges and franchises to corporations of its creation, and in violation of the constitutional provisions of the state.

The questions raised for decision by these several conflicting contentions are important to complainants and all others similarly situat-

ed with them, the state, as represented by its defendant officials, and the public at large, in that the validity of an act of the Legislature of the state declaring the will of the state on a question of great public importance is challenged, and its validity must be determined. However, as said by Chief Justice Marshall delivering the opinion of the court in the great case of Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257:

> "It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the Legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty."

Therefore, with due regard for the importance of the questions presented and the responsibility attendant upon their decision, we shall proceed to a determination of the cases. And, first, let us inquire whether it be true, as contended by defendants, these suits in legal effect have been brought and are sought to be maintained against the sovereign state of Oklahoma in violation of the eleventh amendment to the Constitution of the United States; for in the orderly administration of justice no court should proceed to decision unless satisfied of its right to so do. We shall therefore first advert to the question of jurisdiction of this court to proceed at the suit of complainants against defendants who occupy official positions in the state and stand charged with the public trust imposed on them by its laws; for, if it be true defendant officials are sought to be restrained or prevented by complainants from carrying out the will of the state, as lawfully expressed through the legislative branch of its government, in the exercise of its sovereign power to legislate, then these suits are in a true and just sense directed against the sovereign state of Oklahoma, because they are brought and sought to be maintained against those who are admitted to be the lawfully constituted representatives of the state, charged by its laws with the performance of certain public duties.

However, the inquiry here necessary to be made does not end with the determination that defendants are lawfully constituted representatives of the state. That much is conceded. The question rather is: Has the Legislature of the state by the act in question sought to impose on defendants, its lawfully constituted representatives for some purposes, the discharge of other duties, over and beyond its constitutional powers to impose, the performance of which by defendants will result in injury to complainants? For, if so, as the Legislature of the state acted outside its constitutional bounds, the act must fall, and in falling carry down the obligations and duties sought to be imposed upon defendants, and they will be left standing naked, as individuals clothed with no power or authority emanating from the state, and thus viewed and considered alone as individuals assuming to act under the

guise of law where no law exists; for an unconstitutional act is not law, confers no power, and creates no office.

Mr. Justice Field, in Norton v. Shelby County, 118 U. S. 425, 6 Sup. Ct. 1121, 30 L. Ed. 178, said:

"An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

Mr. Justice Peckham, delivering the opinion of the court in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, after an extended review of many prior decisions of that court, says:

"The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the federal Constitution, may be enjoined by a federal court of equity from such action."

In Illinois Central Railroad Co. v. Adams, 180 U. S. 28, 21 Sup. Ct. 251, 45 L. Ed. 410, Mr. Justice Brown, delivering the opinion, says:

"The question whether this is a suit against the state, within the eleventh amendment to the Constitution, which provides that the judicial power of the United States shall not be construed to extend to suits against one of the United States by citizens of another state, is also one which we think belongs to the merits, rather than to the jurisdiction. If it were a suit directly against the state by name, it would be so palpably in violation of that amendment that the court would probably be justified in dismissing it upon motion; but the suit is not against the state, but against Adams individually, and if the requisite diversity of citizenship exist, or if the case arise under the Constitution or laws of the United States, the question whether he is so identified with the state that he is exempt from prosecution, on account of the matters set up in the particular bill, are more properly the subject of demurrer or plea than of a motion to dismiss. This seems to have been the opinion of Chief Justice Marshall in Osborn v. Bank of the United States, 9 Wheat. 738, 858, 6 L. Ed. 204, wherein he makes the following observation: 'The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties.'"

See, also, Scully v. Bird, 209 U. S. 481, 28 Sup. Ct. 597, 52 L. Ed. 899.

Hence it appears too clear for argument we must first consider and determine the validity of the act challenged by complainants before we are qualified to pass upon the objection urged that the suits are in effect against the state, and as such in contravention of the eleventh amendment to the Constitution. We shall, therefore, proceed to the constitutional validity of the act quoted. And, first, let us consider whether the charge made against the act by complainants, that the true legislative intent and purpose is not expressed in its title, but, on the contrary, the sole, dominant object and purpose of the Legislature in the passage of the act was to prevent the transportation through pipe lines of natural gas from out of the state, and

whether such purpose clearly appears from an examination of the provisions of the act itself; for, if so, it is quite clear this court may and should consider the act in its true light, regardless of the purpose expressed in its title.

There can be no doubt, we think, but that the purpose of the act as expressed in its title is clearly within the constitutional power of the Legislature of the state and impervious to any objection emanating from that source. By a reference to the act itself, it will be seen section 1 provides for the formation of domestic corporations to engage in the business of transporting natural gas within the state, a power clearly within constitutional limits, standing by itself. However, section 2 provides no such corporation shall be granted a charter to transport natural gas through pipe lines unless as a condition precedent to such grant it shall stipulate as follows: First, that it will transport natural gas only in the state; second, that it will not connect with, transport, or deliver natural gas to individuals, associations, companies, or corporations engaged in carrying or furnishing natural gas to points, places, or persons without the state; and, further, that such stipulation or contract with the state shall be embodied in its charter, and unless such company so contracts it cannot exercise the power of eminent domain, and cannot acquire any right to cross over, under, or along the highways of the state. Section 3 declares that foreign corporations engaged in transporting natural gas by means of pipe lines shall never be licensed by or permitted to conduct such business within the state. By section 4 it is provided that no association, combination, partnership, or corporation shall be granted the right to exercise the power of eminent domain for the purpose of acquiring a right of way for its pipe lines in the state, unless incorporated under this act. By section 5 it is provided the construction or maintaining of a natural gas pipe line along, under, over, or across any public highway of the state, or any streets, alleys, or public ground of any city in the state, is an additional burden on the servitude or easement theretofore granted. Section 6 provides for the laying of natural gas pipe lines under the supervision of the mine inspector of the state. Section 7 makes provision for the tensile strength of the materials employed in constructing any natural gas pipe line, and further provides against the pumping of gas from wells into such mains. Section 8 expressly provides against any corporation so organized transporting any natural gas out of the state, also provides against any such corporation connecting, attempting to connect, or threatening to connect with any pipe line transporting natural gas outside or beyond the limits of the state, and makes the act of any such corporation in so doing a ground of forfeiture of all its corporate rights theretofore granted, following by the confiscation of all its property to the state, and other drastic and unusual punishment not only visited on the offending corporation itself, but on its stockholders and others. Section 9 makes provision for the inspection of natural gas pipe lines employed by public service corporations in the state, and provides that factories located wholly within the state may maintain private pipe lines to obtain their supply. Section 10 provides a complete and absolute prohibition

against all persons, firms, associations, and corporations constructing or operating a pipe line in the state for the purpose of transporting natural gas, except they shall become a body corporate under the terms of this act.

From this reference to the body of the act, it is seen, in some respects, the Legislature proceeded in pursuance of its undoubted legislative power, and in such matters the act is plainly valid, even if its remaining features be found void, if such valid matters be found capable of separation from the invalid parts. But can any reasonable man of limited intelligence, from an examination of the act, believe the true intent and purpose of the Legislature was to make provision for such minor details as inspection of pipe lines laid for the transmission of natural gas, the incorporation of pipe line companies to transport natural gas, or the conferring on such companies of the power of eminent domain, or the right to use the public highways of the state, or the streets and alleys of its cities, or other like purposes expressed in the title of the act? On the contrary, can any reasonably intelligent mind read this act and remain blind to and unaware of the real purpose sought to be accomplished thereby? Does not every section and line, save in respect to matters of minor importance mentioned, proclaim in the loudest tones, and in the most positive and convincing manner, a subtle and determined purpose to forever foreclose all persons from the attempt to convey in any manner, through the instrumentality of pipe lines, natural gas out of the state, and to thus cut off and destroy any interstate transportation of such product as effectually as though such business had been in express terms interdicted? We have encountered no doubt whatever in arriving at the conclusion the charge made against the act by complainants, that its true intent and purpose is not stated in its title, but that the dominant object and purpose of the act was to place within the grasp of the state the absolute dominion and control of the business of transportation of natural gas through pipe lines (the only practicable method of conveyance of such product known), to the end that by the exercise of such control it might absolutely and forever prohibit its transportation beyond the territorial boundaries of the state, is true.

That this court may, should, and will look beyond the purpose of the act as declared in its title, to ascertain from an examination of its body the true object sought to be accomplished thereby, is open to neither dispute nor doubt. Mr. Justice Harlan, delivering the opinion of the court in Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, said:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police power of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (Sinking Fund Case, 99 U. S. 700, 718, 25 L. Ed. 496), the courts must obey the Constitution rather than the lawmaking department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176, 2 L. Ed. 60, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?

The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretense. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, * * * whenever they enter upon the inquiry. whether the Legislature has transcended the limits of its authority. If, therefore, a statute, purporting to have been enacted to protect the public health. the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured * * * by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

Mr. Justice Matthews, in the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, in passing on a city ordinance of the city of San Francisco, fair on its face, said:

"In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinance complained of, as tried merely by the opportunities which their terms afford of unequal and unjust discrimination in their administration; for the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the fourteenth amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. The principle of interpretation has been sanctioned by this court in Henderson v. Mayor of New York, 92 U. S. 259, 23 L. Ed. 543; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550; Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567; and Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145."

Viewed in the light of authority, tested by the very reason and common sense of the situation disclosed by the record in these cases, can the state, through its defendant officers, accomplish the object and purpose sought to be attained by it in the passage of the foregoing act? That is, can it prohibit the exportation of natural gas beyond its borders, and thus conserve it for the use, benefit, and enjoyment of its own people, and the upbuilding and fostering of manufacturing establishments and other commercial industries and enterprises, the result of which will serve to increase the taxable wealth of the citizens of its state, and make it commercially great and prosperous among the sisterhood of states? In other words, the question of supreme importance here presented for decision, in its last analysis, is this: Does a state possess the constitutional power, derivable from any source whatever under our Constitution and laws, to prohibit, through its legislative assembly and lawfully constituted officials assuming to act in pursuance of its expressed will, the transportation of natural gas in interstate commerce, or persons from engaging in such enterprise in a lawful manner? For, unmasked and shorn of all pretexts, evasions, and subterfuges, this is beyond all cavil precisely what the act in controversy contemplates, and its enforcement, if valid, means;

for it is both incomprehensible and inconceivable to our minds that it might even be thought by any one that another view of the act in question should be taken by a court, or that it might in the end be solemnly decreed that which is abortive and ineffectual if attempted by direction shall become virile and impregnable to attack if sheltered behind such subterfuges, glossed by such pretexts, or coated with such evasions as are here employed, which are, as was so well said by Judge Philips in United States v. Colorado & N. W. R. R. Co., 157 Fed. 342, 85 C. C. A. 48, "but the rose in the mailed hand."

In the determination of the question thus presented it is well to ever bear in mind this nation is no longer and in no just sense simply a confederacy of sovereign states, acting by virtue of a joint agreement, with all the jealousies, discords, weaknesses, and perils attendant thereon, but it is a single, effective, united, centralized, organized, powerful, fearless nation, whose Constitution and laws, enacted in pursuance thereof, are the supreme law of this land, binding, controlling, and governing the conduct of the most powerful state and the most humble citizen alike; that its constitutional power extends to every foot of space and every subject-matter within its territorial limits, and is there ever present and acting. State lines do not affect its operation, and state laws cannot trench upon the exercise of its authority. Such a national government, invested with such national powers, the thirteen original states formed for their mutual welfare, protection, and advantage, after a vain and futile attempt to live and subsist under a government formed by a confederacy of states. To the continued existence and perpetuity of such a national government, truly national and supreme, not alone in name, but in the dignity and majesty of power, each succeeding state admitted into the Union, as a condition precedent to its admission, irrevocably consented, and will remain bound by such consent until time shall be no more. Wherever goes this national power, there goes the power of the courts for its enforcement. As said by Chief Justice Marshall in Cohens v. Virginia, supra:

"That the United States formed, for many and for most important purposes, a single nation, has not yet been denied. In war, we are one people. In making peace, we are one people. In all commercial regulations, we are one and the same people."

True it is, hand in hand with the supreme national power, within its territorial borders, goes the sovereign power of the state, operating upon all matters of purely local or intrastate concern, which have not been committed to the control of the nation. The two powers, each in its proper sphere supreme, invade all our national space, wherever states have been created and their boundaries marked out, existing in absolute harmony one with the other, never, when properly interpreted, understood, and applied, coming in conflict with each other, but moving onward and upward in perfect harmony toward a broader and better civilization and a higher national destiny for all, with that accuracy and precision that governs the movement of the planets in their orbits or the seasons in their course. Considered in this light, let us proceed to a determination of the questions presented, stopping to inquire, on the one hand, whether the constitutional objections

interposed by complainants to the validity of the act in question, viewed in its true light, are sound and tenable, as the limits of those objections have been pointed out and applied by courts of the highest standing from the beginning, and, on the other hand, whether the power attempted to be exercised in this instance by the state is within its proper sphere of influence, or comes in conflict with the exercise of powers expressly delegated to the nation or withheld from the state.

Complainants first contend the act in question, viewed as one intended to prohibit the transportation of natural gas without the territorial limits of the state by means of pipe lines, is void, because repugnant to clause 3 of section 8, art. 1, of the federal Constitution, which confers on Congress the exclusive right "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Mr. Hare, in his work, on American Constitutional Law (page 1257), in speaking of the power thus conferred on Congress, says:

"So vast is the subject of this power, and so much does it comprise, that its limits cannot well be defined without the risk of excluding something which may in some form, or at some time, deserve to be included. It is given in the largest and most liberal terms, and has been interpreted and applied with adequate, if not equal, liberality."

Chief Justice Marshall, delivering the opinion of the court in the great case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, said:

"Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one."

Again:

"Commerce, in its simplest signification, means an exchange of goods; but, in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange become commodities, and enter into commerce. The subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation."

Again:

"Interstate commerce, or commerce among the several states, is commerce that concerns more than one state. The only form of commerce within the limits of the United States which is not subject to the vast and exclusive power of Congress is the purely internal commerce of each state, which is reserved to each by direct implication."

Mr. Justice Field, in Welton v. State of Missouri, 91 U. S. 275, 23 L. Ed. 347, said:

"Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different states. The power to regulate it embraces all the instruments by which such commerce may be conducted."

Mr. Justice Peckham, in Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, said:

"Definitions as to what constitutes interstate commerce are not easily given, so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance. It comprehends, as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different states, and the power to regulate it embraces all the instruments by which such commerce may be conducted. Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347; Mobile County v. Kimball, 102 U. S. 691, 26 L. Ed. 238; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Hooper v. California, 155 U. S. 648, 653, 15 Sup. Ct. 207, 39 L. Ed. 297; United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325."

Mr. Justice Brewer, delivering the opinion in Re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, said:

"Up to a recent date commerce, both interstate and international, was mainly by water, and it is not strange that both the legislation of Congress and the cases in the courts have been principally concerned therewith. The fact that in recent years interstate commerce has come mainly to be carried on by railroads and over artificial highways has in no manner narrowed the scope of the constitutional provision or abridged the power of Congress over such commerce. On the contrary, the same fullness of control exists in the one case as in the other, and the same power to remove obstructions from the one as from the other. Constitutional provisions do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel, yet in its actual operation it touches and regulates transportation by modes then unknown, the railroad train and the steamship. Just so it is with the grant to the national government of power over interstate commerce. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

The reason for conferring this unbounded and exclusive reach of power on Congress, if reason need be given, is not only familiar to all students of the history of our country, but this reason has been stated and emphasized by oft-repeated decisions of the Supreme Court until it is no longer misunderstood by any one. In Welton v. State of Missouri, supra, it is said:

"The very object of investing this power in the general government was to insure this uniformity against discriminating state legislation. The depressed condition of commerce and the obstacles to its growth previous to the adoption of the Constitution, from the want of some single controlling authority, has been frequently referred to by this court in commenting upon the power in question. 'It was regulated,' says Chief Justice Marshall, in delivering the opinion in Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678, 'by foreign nations, with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them became so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government contributed more to that great revolution which introduced

the present system than the deep and general conviction that commerce ought to be regulated by Congress."

Mr. Chief Justice Waite, delivering the opinion of the court in Pensacola Tel. Co. v. Western, etc., Tel. Co., 96 U. S. 1, 24 L. Ed. 708, said:

"The powers thus granted are not confined to the instrumentalities of commerce or of the postal service known or in use when the Constitution was adopted; but they keep pace with the progress of the country and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stagecoach, from the sailing vessel to the steamboat, from the coach and steamboat to the railroads, and from the railroads to the telegraph, as these agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation, it is not only the right, but the duty, of Congress to see to it that intercourse among the states and the transmission of intelligence are not obstructed or unnecessarily incumbered by state legislation."

Therefore, there can be no doubt whatever but that the transportation of natural gas in interstate commerce through pipe lines is interstate commerce within the meaning of the commerce clause of the federal Constitution, unless the very nature of the article itself, natural gas, is such as to take it out of the domain of commerce, as that term is employed in the Constitution, and consequently to place it within the power of the Legislature of Oklahoma to control, regulate, or prohibit, as is attempted by the act in question.

On this head it is the contention of defendants that natural gas must be considered as animals feræ naturæ, running streams, the air we breathe, and our forest reserves, which are the common heritage of the whole people, which the state, as the representative of all the people, by virtue of this common ownership, may regulate and control for the benefit of all, and over which no man may acquire such absolute ownership as the state may not regulate or·control; and the cases of Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793, relating to the transportation of wild game, Georgia v. Tennessee Copper Co., 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038, relating to the contamination of the air of Georgia by fumes from the smelters of the defendant company, and Hudson Water Co. v. McCarter, 209 U. S. 349, 28 Sup. Ct. 529, 52 L. Ed. 828, relating to the carriage of the waters of·the Passaic river of New Jersey into New York, are cited in support of the contention·made.

In this connection we deem it neither wise nor necessary to attempt a determination of what precise rule of property rights shall govern and control the disposition of the vast deposits of petroleum, gas, and oil found in this state; for on this question the decisions of the highest judicial tribunals of those states in which these minerals abound are not in harmony.. Whether the rule first announced in the case of Hail v. Reed, 15 B. Mon. (Ky.) 479, and followed by the courts of last resort in all the great oil and gas producing states save one, Indiana, shall become the law of this class of property in this state, is deemed immaterial to a decision here; for, whichever rule may be adopted, the conclusion here reached must be the same, as will be seen

from a statement of the rules. The rule of property right in natural gas and oil in all the states save Indiana is stated by Mr. Justice Shiras in Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304, as follows:

"Petroleum gas and oil belong to the owners of the land, and are a part of it, so long as they are on it or in it, or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas extending under his neighbor's field, so that it comes into his well, it becomes his property."

See, also, Snyder on Mines, pp. 954–958, § 1170; Thornton on Oil and Gas, pp. 18–20; White on Mines and Mining Remedies, p. 223, § 162; Funk v. Haldeman, 53 Pa. 248; Stoughton's Appeal, 88 Pa. 198; Blakeley v. Marshall, 174 Pa. 429, 34 Atl. 564; Gill v. Weston, 110 Pa. 317, 1 Atl. 921; Gas Co. v. DeWitt, 130 Pa. 249, 18 Atl. 724, 5 L. R. A. 731; Chartiers Block Coal Co. v. Mellom, 152 Pa. 297, 25 Atl. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645; Hague v. Wheeler, 157 Pa. 341, 27 Atl. 714, 22 L. R. A. 141, 37 Am. St. Rep. 736; Murray v. Alfred, 100 Tenn. 100, 43 S. W. 355, 39 L. R. A. 249, 66 Am. St. Rep. 740; Moore v. Griffin, 72 Kan. 164, 83 Pac. 395, 4 L. R. A. (N. S.) 477; Isom v. Rex Crude Oil Co., 147 Cal. 659, 82 Pac. 317; Ontario Natural Gas Co. v. Gossfield, 18 Ont. App. 666; Hughes v. Pipe Lines, 119 N. Y. 423, 23 N. E. 1042; Williamson v. Jones, 39 W. Va. 256, 19 S. E. 436, 25 L. R. A. 222; South Penn Oil Co. v. McIntire, 44 W. Va. 305, 28 S. E. 922; Carter v. Tyler County Court 45 W. Va. 806, 32 S. E. 216, 43 L. R. A. 725; Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; Wilson v. Youst, 43 W. Va. 834, 28 S. E. 781, 39 L. R. A. 292; Preston v. White, 57 W. Va. 278, 50 S. E. 236; Kelley v. Ohio Oil Co., 57 Ohio St. 328, 49 N. E. 399, 39 L. R. A. 765, 63 Am. St. Rep. 721; Gas Co. v. Ullery, 68 Ohio St. 271, 67 N. E. 494; Honemaker v. Amos, 73 Ohio St. 170, 76 N. E. 949, 4 L. R. A. (N. S.) 980, 11 Am. St. Rep. 708; Hail v. Reed, 15 B. Mon. (Ky.) 479; Brown v Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304.

The rule adopted by the courts of Indiana is this: The owner of the fee of oil or gas bearing lands does not have an absolute ownership in the oil or gas in place in the land, but a qualified ownership only, capable, however, of being made absolute by reduction to possession. Jamieson v. Oil Co., 128 Ind. 555, 28 N. E. 76, 12 L. R. A. 652; State v. Ohio Oil Co., 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627.

However, as has been stated, which of the two is the better rule of decision, and the one which should be adopted as controlling property rights in this class of property in this state, we deem it neither necessary nor proper to here determine: for it is clear, even if the Indiana rule should be adopted, the contention made by defendants that there exists in the people of the state, in the natural gas found within the state, such a common ownership as the state may control and protect for the benefit of the whole people, as it may the wild game of the state, the common air, the flowing streams, etc., must be denied, for this precise point was ruled in clear and forceful language by the Supreme Court, Mr. Justice White delivering the opinion, in Ohio Oil

Company v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729, where, giving effect to the property rule established by the courts of Indiana, it is said:

"But, whilst there is an analogy between animals feræ naturæ and the moving deposits of oil and natural gas, there is not identity between them. Thus the owner of land has the exclusive right on his property to reduce the game there found to possession, just as the owner of the soil has the exclusive right to reduce to possession the deposits of natural gas and oil found beneath the surface of his land. The owner of the soil cannot follow game when it passes from his property; so, also, the owner may not follow the natural gas when it shifts from beneath his own to the property of some one else within the gas field. It being true as to both animals feræ naturæ and gas and oil, therefore, that whilst the right to appropriate and become the owner exists, proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things feræ naturæ all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil, no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are owners, every one may be absolutely prevented from seeking to reduce to possession. No divesting of private property, under such a condition, can be conceived, because the public are the owners, and the enacting by the state of a law as to the public ownership, is but the discharge of the governmental trust resting in the state as to property of that character. Geer v. Connecticut, supra. On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property."

And the same distinction between things feræ naturæ and natural gas was recognized in Attorney General v. Hudson County Water Co., 70 N. J. Eq. 695, 65 Atl. 489, where it is said:

"We may concede, also, for present purposes, that subterranean waters, such as may be reached only by driving wells, when thus acquired, become absolutely the property of the proprietor of the soil, and may be dealt with by him as merchandise, and that, if they be thus converted into a merchantable commodity, the state would not be permitted to prohibit its transportation beyond the confines of the state. Water thus taken from wells may be placed on the same plane with oil and natural gas, concerning the latter of which it was held by the Supreme Court in Indiana in State ex rel. Corwin v. Indiana & Ohio Oil, etc., Co., 120 Ind. 575, 22 N. E. 778, 6 L. R. A. 579, that the state could not constitutionally prohibit its transportation beyond the confines of the state."

From all of which it becomes apparent the contention of defendants that the natural gas found within the territorial limits of the state is the common heritage of the people of the state, which may be conserved and preserved by the state as trustee of those things in which the people have a common interest, as flowing streams, wild animal life, etc., is unsound and must be denied. On the contrary, it must be held he who by lawful right reduces to his possession mineral, gas, or oil has the same absolute right of property therein, with the same power of barter, sale, or other disposition, including, of necessity, the right of transportation and delivery under such reasonable rules and safeguards as the exigencies of the case may demand and the state employ, as the farmer has of his corn, his wheat, or his stock,

or the merchant of his wares, and such absolute right therein as the state cannot deny him without making just compensation, and any attempt to so do would be in violation of the fourteenth amendment to the federal Constitution, which provides:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

And it would be also violative of the correlative guaranty found in section 24, art. 2, of the Constitution of the state, in that it would constitute a taking of private property without just compensation made to the owner. While it is undoubtedly true, as has been many times decided by the Supreme Court, a state may entirely exclude a foreign corporation from doing business within the state, or may admit it on such terms and conditions as it may deem proper to impose (Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657); and, again, may rightfully and at its discretion confer upon or withhold from corporations of its creation the exercise of lawful corporate powers and franchises, yet such conceded lawful exercise of power on the part of the state does not meet the exigencies of the present situation, for here complainants, both personal and corporate, are seeking no rights of franchise or privilege from the state. They are insisting on the right to transact no intrastate business of any kind or character. On the contrary, by their bills presented they expressly disclaim any such intention. What they do seek is to enter the state for the purpose of engaging in interstate business in a commodity, the lawful subject of private ownership, or to transport without the state private property of which they are the lawful owners, now within the state, for the purpose of its sale and disposition, or to employ property owned by them in the state in interstate transportation; and in attempting to so do they are confronted by defendants, assuming to act under authority of the act in question, which, if valid, deprives them of that dominion over and right incident to the ownership of private property, which, as contended by complainants, they may not lawfully be denied without just compensation made to them. And this leads us to inquire: What is property? And what constitutes such taking of private property as is inhibited by the constitutional provisions in question? The Century Dictionary defines the word "property" as follows:

"The right to the use or enjoyment or the beneficial right of disposal of anything that can be the subject of ownership; ownership; estate; especially, ownership of tangible things."

"The word 'property,' as applied to lands, comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which lie in contract, those which are executory, as well as those which are executed." Soulard v. United States, 4 Pet. 511, 7 L. Ed. 938.

Mr. Justice Field, in Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394, said:

"It is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, without unreasonable regulation or molestation."

And, again:

"There is no more sacred right of citizenship than the right to pursue un-molested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

The same learned justice, in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, said:

"By the term 'liberty,' as used in the provision, something more is meant than mere freedom from physical restraint or the bounds of a prison. It means freedom to go where one may choose, and to act in such manner, not inconsistent with the equal rights of others, as his judgment may dictate for the promotion of his happiness; that is, to pursue such callings and avoca-tions as may be most suitable to develop his capacities and give to them their highest enjoyment."

Mr. Justice Miller, in Pumpelly v. Green Bay Company, 13 Wall. 166, 20 L. Ed. 557, said:

"It would be a very curious and unsatisfactory result, if, in construing a provision of constitutional law always understood to have been adopted for protection and security to the rights of the individual as against the govern-ment, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that sub-ject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction, without making any compensation, because, in the nar-rowest sense of that word, it is not 'taken' for the public use. Such a con-struction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right un-der the pretext of the public good, which has no warrant in the laws or prac-tices of our ancestors."

Mr. Justice White, in Ohio Oil Company v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729, says:

"On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right, which belongs to them, without a taking of private property."

Mr. Justice Field, in Charlotte, etc., Railroad v. Gibbes, 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051, said:

"Private corporations are persons within the meaning of the amendment. It has been so held in several cases by this court. Santa Clara County v. South-ern Pacific Railroad Co., 118 U. S. 394, 6 Sup. Ct. 1132, 30 L. Ed. 118; Pem-bina Mining Co. v. Pennsylvania, 125 U. S. 181, 189, 8 Sup. Ct. 737, 31 L. Ed. 650; Minneapolis & St. Louis Railroad Co. v. Beckwith, 129 U. S. 26, 9 Sup. Ct. 207, 32 L. Ed. 585."

It is, again, the insistence of the defense, should it be determined natural gas is in its nature such a product as to be susceptible of ab-solute, individual, private ownership, with all rights incident to such ownership, including that of transportation, sale, and delivery, which rights are beyond the power of the state to take away without just compensation made to the owner, yet it is earnestly insisted the state in the exercise of its sovereign power of eminent domain may either grant or withhold the exercise of that power at will. Therefore it

may, as it has done in this case, confer it on corporations of its own creation and deny it to all others, including the complainants.

The contention made, in so far as stated, we think sound beyond doubt. However, based on this well-established premise, it is further insisted by the defense that the fee to what is called the "public highways" in this state is vested in the state for the common benefit of the whole people. Therefore it is urged the state possesses the same power and control over its public highways, to prevent the laying of natural gas mains along, over, or across them ordinarily possessed by cities over their public streets, alleys, and other public places; and as complainants are rightfully denied the exercise of the power of eminent domain to procure a right of way, and are rightfully denied by the act in question the right, privilege, or franchise of going upon, along, over, across, or under the highways of the state with their pipe lines, therefore the conclusion is drawn that whatever rights complainants may have acquired by virtue of private contract, or may in future acquire in such manner, yet as the state may lawfully withhold from or deny to complainants the use or occupancy of its public highways in any and all manners, it may lawfully and effectually block all endeavor on the part of complainants and all others to construct pipe lines designed or intended for the purpose of transporting natural gas from out the state, whether such gas be owned by complainants or others; and the cases of St. Louis v. Western Union Telegraph Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380, Western Union Tel. Co. v. Penn. R. R. et al., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516, New Orleans Water Works Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273, 29 L. Ed. 525, Northwestern Telegraph Exchange Company v. City of St. Charles (C. C.) 154 Fed. 386, and many other cases, are cited in support of the conclusion stated.

Without either conceding or deciding the correctness of the result obtained by this process of reasoning, should the soundness of the premises on which it is based be conceded, as applied to the act in question, which has been found to have been designed and intended as an absolute prohibition on interstate commerce of a product the subject of exclusive, private ownership, with all the rights incident to such ownership, including the right of sale, transportation, and delivery, yet we conceive the very postulate on which the logic employed is based is radically unsound in this:

The lands involved in these suits, and all lands within the jurisdiction of this court, comprised what was known as Indian Territory. The fee to the rural public highways in that portion of this state formerly comprising Indian Territory, and now the Eastern district, does not vest in the state for the benefit of the whole people, as premised by the defense; but it does vest in the abutting landowners. The public have only a perpetual servitude or easement therein, and the abutting landowner may use the highway for his own benefit and enjoyment in such manner as is not inconsistent with the superior rights of the public to pass over, maintain, and improve the easement granted; whereas, the public streets, squares, alleys, and other public places of cities of this country, as a very general rule, by act of public dedica-

tion by the owner and founder, pass to the city in its corporate capacity for the benefit of the public, absolutely in fee, for use, enjoyment, control, and disposition by the corporation. For this reason, in our judgment, the authorities cited by solicitors for the defendants do not apply.

It was the rule of civil law that the fee to public highways vested in the state. Dunham v. Williams, 37 N. Y. 254; Mitchell v. Bass, 33 Tex. 259; Renthrop v. Bourg (La.) 4 Mart. (O. S.) 97; Hatch v. Arnault, 3 La. Ann. 482; Mendez v. Dugart, 17 Id. 171; Bradley v. Pharr, 45 La. Ann. 426, 12 South. 618, 19 L. R. A. 647. It has ever been the rule of the common law that the fee of highways vested in the abutting landowners, and not in the state. Mr. Justice Story, delivering the opinion of the court in United States v. Harris, 1 Sumn. 21, Fed. Cas. No. 15,315, said:

"The general principal of the common law is that the soil over which a street or highway is laid still remains the property of the original owner, subject to the easement."

Mr. Justice McLean, delivering the opinion of the court in Barclay v. Howell, 6 Pet. 498, 8 L. Ed. 477, said:

"By the common law the fee in the soil remains in the original owner where a public road is established over it; but the use of the road is in the public. The owner parts with this use only; for, if the road shall be vacated by the public, he resumes exclusive possession of the ground, and while it is used as a highway he is entitled to the timber and grass which may be grown upon the surface and to all minerals that may be found below it. He may bring an action of trespass against any one who obstructs the road."

These lands were, until recently, the tribal property of the Cherokee, Creek, Choctaw, Chickasaw, and Seminole tribes of Indians, not subdivided by survey, and without legally defined public highways. Recently they have been surveyed, and by separate acts of Congress as to each tribe, based upon tribal agreements, have been allotted to the individual Indians in severalty, with a view to statehood, which soon followed. In these various acts of Congress provision was made for public highways. As to the Cherokee Nation, wherein lies the particular land involved in these suits, it was provided by Act Cong. July 1, 1902, c. 1375, § 37, 32 Stat. 722:

"Public highways or roads two rods in width, being one rod on each side of the section line, may be established along all section lines without any compensation being paid therefor, and all allottees, purchasers and others shall take the title to such land subject to this provision."

Similar provisions were contained in the acts relating to the other nations, providing for public highways of various widths, but in each case providing that the allottees, purchasers, and others should take title to such lands subject to the highway rights therein provided for. It is clear, therefore, that the fee to the land comprising rural highways in what was formerly Indian Territory vests in the abutting landowners, subject only to the easement granted the public for highway purposes, following the rule of the common law.

It is unnecessary for the present consideration to determine the status of highways in that portion of the state which was formerly

Oklahoma Territory; for while the laws in force in that territory at the time of the admission of the state into the Union, not repugnant to the Constitution and not locally inapplicable, were extended over the entire state, in our judgment nothing contained therein can be held to affect the status of the rural public highways under consideration, especially in view of the terms of the enabling act and the Constitution established pursuant thereto, even if it were conceded that a different condition with regard to title of rural public highways existed in Oklahoma Territory.

It being therefore determined the fee of the rural highways over the lands involved vests in the adjoining landowners, as in most of the other states of this Union, what are the rights of the owners of the fee therein? This question has many times received the consideration of the courts. In Perley v. Chandler, 6 Mass. 454, 4 Am. Dec. 159, Chief Justice Parsons, delivering the opinion of the court, said:

"But the soil and freehold remains in the owner, although incumbered with a way; and every use to which the land may be applied and all the profits which may be derived from it consistently with the continuance of the easement the owner can lawfully claim. He may maintain ejectment for the land thus incumbered; and if the way be discontinued he shall hold the land free from this incumbrance. Upon these principles there can be no doubt but that the owner of the land can sink a drain or any water course below the surface of his land covered with a way, so as not to deprive the public of this easement."

In Woodring v. Forks Township, 28 Pa. 361, 70 Am. Dec. 134, Chief Justice Lewis, delivering the opinion of the court, said:

"A man who owns the soil on which the public has a highway, has a right to enjoy his property in every way that may promote his interest or convenience, so that he takes care not to injure the public easement. 'Sic utere tuo ut alienum non lædas' is the maxim which applies in such cases. He might cut a passage across the road for the purpose of draining his land or leading water to his mill, because the land is his own and he may use it for all legitimate purposes."

In Starr v. Camden, etc., R. R. Co., 24 N. J. Law, 597, it was held by the Supreme Court of New Jersey as follows:

"This easement [of a public highway] does not comprehend any interest in the soil, nor give the public the legal possession of it. The right of a freehold is not touched by the establishing of a highway, but continues in the owner of the land, in the same manner that it was before the highway was established, subject to easement. This principle is so universally recognized that it would seem to be a work of supererogation to cite authorities to sustain it; hence the owner of the soil may lay water pipes, gas, or other pipes below the surface, may excavate for a vault or dig for mining purposes, and use it in any other manner that does not interrupt the free passage over it. He retains the full possession of it, subject only to the easement. He may fell the trees upon it, cut the grass, or depasture it."

In Papworth v. City of Milwaukee, 64 Wis. 389, 25 N. W. 431, it was held:

"A lot owner, being the owner of the fee to the middle of the street, may construct vaults or other areas under the sidewalk, with opening in the walk, if this be done in such a manner as not to interfere with or endanger public travel."

In Commissioners of Shawnee County v. Beckwith, 10 Kan. 607, it was held:

"In this state the statutes provide for the establishment of public roads and highways; but both the Constitution and statutes are silent as to how much of the land, or what interest therein, shall pass to the public, and how much of the land, or what interest therein, shall remain with the original proprietor. Therefore we would infer that nothing connected with the land passes to the public, except what is actually necessary to make the road a good and sufficient thoroughfare for the public. The public obtains a mere easement to the land. It obtains only so much of the land, soil, trees, etc., as is necessary to make a good road. It obtains the right for persons to pass and repass, and to use the road as a public highway only, and nothing more. Caulkins v. Mathews, 5 Kan. 199, 200. and cases there cited. The fee in the land never passes to the public, but always continues to belong to the original owner. He continues to own the trees, the grass, the hedges, the fences, the buildings, the mines, quarries, springs, water courses, in fact everything connected with the land over which the road is laid out, which is not necessary for the public to use as a highway. Angell on Highways, pp. 301 to 312, ch. 7, and cases there cited. He may remove all of these things from the road, or enjoy them in any other manner he may choose, so long as he does not interfere with the use of the road as a public highway. No other person has any such rights. In fact, the original owner has a complete and absolute domain over his land, and over everything connected therewith after the road is laid out upon it, as he had before, except only the easement of the public therein."

In Overman v. May, 35 Iowa, 89, it was said:

."The fee therein being deemed to be in plaintiff, the public has no right other than to use the premises as a highway, than in the right to pass and repass thereon, and the incidental right to repair the same and keep it in proper condition for that purpose. There is no evidence, nor is it claimed in argument, that this use upon which the easement is claimed ever extended beyond this. The title to the land and all the profits to be derived from it, not inconsistent with and subject to the easement, remain in the owner of the soil. He owns all the trees upon it, all the mines and quarries under it. He has all above and under the ground, except the right of way in the public, which is a right of passage."

In Woodruff v. Neal, 28 Conn. 167, Chief Justice Storrs, delivering the opinion of the court, said:

"It is well established in this state, in conformity with the process of the common law, that a highway is simply an easement or servitude conferred upon the public in regard to the right to pass over the land on which it is laid out, and an incident of such right that all use of soil and materials upon it in a reasonable manner for the purpose of making and repairing it. The title of the owner of the land is not extinguished, but is simply so qualified that it can only be enjoyed subject to the easement. He retains all the rights of property in the soil not incompatible with the public enjoyment of the highway, and, whenever the highway is abandoned or lost, the entire and exclusive and unincumbered enjoyment reverts to him. Subject to this right of the public, he may take trees growing upon the land, sink water courses under it, and has a right to every use and profit that can be derived from it, not inconsistent with the easement, and, if disseised (as he may be), can maintain ejectment, and recover possession subject to the easement. He can also maintain trespass for any act done on the land not necessary for the enjoyment of the easement, which would be actionable injury if the land was not covered by a highway."

See, also, on this subject, Cooley on Torts (2d Ed.) 372; Jones on Easements, §§ 478, 479; Washburn on Easements. 252; Kent's Commentaries, 432; Elliott on Roads and Streets, 519.

From this examination of the subject it must be clear, as complainants do not seek to perform any public service for the state, or for any city or town within the state, calling for the use of the streets, alleys, and other public places, or for a contract right in the nature of a franchise to conduct such business, but seek only a right of way for the purpose of laying down and maintaining pipe lines for the transportation of natural gas from within to without the state in interstate commerce, for which no franchise is either necessary or desired, they are at liberty to procure such right of way by private contract, and conduct such operations in a lawful manner, under such reasonable rules and regulations as to inspection and manner of operation, as the state may justly impose.

It is not intended, by anything said in the course of this opinion, to either hold or intimate the state does not possess the power to supervise, control, and regulate in a reasonable manner the method of construction and manner of laying and maintaining pipe lines to be employed in the transportation of natural gas in interstate as well as intrastate commerce, for the purpose of preserving the health and promoting the safety of its citizens and safeguarding the public against accident which may result from the conduct of a business in which a highly inflammable, dangerous, and volatile product is transported. This right of reasonable inspection, supervision, and control, commensurate with the attendant danger, the state has and should exercise in its reserve police power. What we do say, and intend to be understood as saying and meaning, is this: All such regulations must be reasonably adapted and necessary to accomplish the end sought, and the result or end sought to be attained must be such as falls within the scope of the power residing in the state. It must not be employed under disguise for the purpose of prohibiting, regulating, or controlling a proper subject of interstate commerce, for the exclusive power of regulating interstate commerce resides in the Congress under the commerce clause of our national Constitution.

Again, it must not be exerted in disguise for the purpose of denying any person within its jurisdiction the equal protection of the laws, or deny any such person his just property rights without due process of law. Any such state enactment violates the fundamental law of our country, and of this state as well, and must be and will be declared inoperative and void at the suit of the parties injured thereby. As said by Mr. Justice Harlan, in Connolly v. Union Sewer Pipe Company, 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679:

"The question of constitutional law, to which we have referred, cannot be disposed of by saying that the statute in question may be referred to what are called the 'police powers' of the state, which, as often stated by this court, were not included in the grants of power to the general government, and therefore were reserved to the states when the Constitution was ordained. But as the Constitution of the United States is the supreme law of the land, anything in the Constitution or statutes of the states to the contrary notwithstanding, a statute of a state, even when avowedly enacted in the exercise of its police powers, must yield to the law. No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived. The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the su-

preme law.' The state has undoubtedly the power, by appropriate legislation, to protect the public morals, the public health, and the public safety; but if, by their necessary operation, its regulations looking to either of those ends amount to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void. Gibbons v. Ogden, 9 Wheat. 1, 210, 6 L. Ed. 23; Sinnot v. Davenport. 22 How. 227, 16 L. Ed. 243; M., K. & T. Ry. Co. v. Haber, 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878."

Or as said in Ritchie v. People, 155 Ill. 98, 40 N. E. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315:

"But it is claimed on behalf of the defendant in error that this section can be sustained as an exercise of the police power of the state. The police power of the state is that power which enables it to promote the health, comfort, safety, and welfare of society. It is very broad and far-reaching, but is not without its limitations. Legislative acts passed in pursuance of it must not be in conflict with the Constitution, and must have some relation to the ends sought to be accomplished; that is to say, to the comfort, welfare, or safety of society. Where the ostensible object of an enactment is to secure the public comfort, welfare, or safety, it must appear to be adapted to that end. It cannot invade the rights of person and property under the guise of a mere police regulation, when it is not such in fact; and where such an act takes away the property of a citizen, or interferes with his personal liberty, it is the province of the courts to determine whether it is really an appropriate measure for the promotion of the comfort, safety, and welfare of society. Lake View v. Rosehill Cem. Co., 70 Ill. 191, 22 Am. Rep. 71; In re Jacobs, 98 N. Y. 98, 50 Am. Rep. 636; People v. Gillison, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465."

It follows, from what has been said, in our judgment, the act in question, viewed in its true light, as one enacted for the express purpose of forever prohibiting the interstate transportation of natural gas through means of pipe lines from out this state, impinges on the rights of complainants as disclosed by their several bills of complaint, as those rights are guaranteed and protected by our national Constitution, and that of the state as well, in that the act in question attempts to prohibit commerce among the states in property capable of absolute private ownership, with all its incidents, and susceptible of being so transported, and such prohibition violates the commerce clause of our national Constitution, and in that the sole, dominant purpose of the act, as construed above, if enforced against complainants, invades their rights as guaranteed by the fourteenth amendment to the national Constitution, and section 24 of article 2 of the Constitution of this state. In this view of the case, the remaining objections made by complainants to the validity of the act need not be here considered.

It must therefore be held, and is held, in so far as the act in question attempts to prohibit the transportation of natural gas by the complainants in interstate commerce through means of pipe lines constructed for that purpose, or attempts to prohibit complainants from employing their property in interstate commerce, or from engaging in the business of interstate commerce in natural gas, under such reasonable rules and regulations as the state may impose, and the nature of the business transacted may demand for the health and safety of the citizens of the state, it is unconstitutional, void, and beyond the power of the state to enact; that these suits are not in truth and fact against the state in its sovereign capacity, in violation of the eleventh

amendment to the national Constitution, but were brought and are maintained as against defendants, officials of the state, assuming to act in pursuance of authority conferred by the act in question, which is beyond the constitutional power of the Legislature of the state, to the threatened injury and damage of complainants in their property rights; and therefore they may maintain these suits.

It is deemed proper to here state the Supreme Court of the state of Indiana arrived at the same conclusion here reached by us on consideration of an act of the Legislature of that state which in express terms prohibited that which is here attempted to be prohibited by indirection. See State ex rel. Corwin v. Indiana & O. Oil, Gas & Min. Co., 120 Ind. 575, 22 N. E. 778, 6 L. R. A. 579.

And we may be permitted to further remark: Would it not be most singular, indeed, to record in our national history and transmit to generations of readers yet unborn the fact that Oklahoma, rich, not alone in material wealth and natural resources, but in her splendid citizenship, on the very year in which she was admitted into this Union on terms of perfect equality and unity, there to rest forever in peace and safety, free from internal strife and external violence, permitted to participate in the counsels of this great nation and to partake of its benefactions, permitted to share on equal terms with her sister states in that pride of memory of the noble souls who redeemed this land from the wilderness and kept it free from the hand of the oppressor, of those matchless intellects who conceived and fashioned our form of government, and guided it safely through the trials and perils incident to the establishment of the first enduring representative republic the world has ever known, of those heroic spirits who died that this nation might live, one and inseparable, and that the principles of free government might not perish from the earth, permitted, on her own invitation, to share in the grandeur of its national accomplishments and the magnificence of its international power—that this great state would, even though she could, not out of her poverty or necessity, but out of her abundance of mineral wealth, lock herself up as within a self-imposed Chinese Wall, and thus refuse to share in her plenty and exchange nature's benefactions with her sister states, in return for the many favors conferred on her by the nation? May it not be justly and timely inquired: What has become of our vaunted Western hospitality and our boasted Southern chivalry? For in Oklahoma, more than in any other state of this Union, West and South unite. We conceive the fulfillment of the design here attempted to be neither within the limits of possibility of accomplishment under the Constitution and laws of our common country nor the end sought desirable to the state, even if accomplished.

Therefore let the demurrers interposed by the defendants be overruled, with such leave to plead over, if so advised by their solicitors, as may be granted by the presiding judge of this court in his order; and, further, let the provisional injunctions applied for by complainants be granted on such conditions as to bonds as may be determined by the judge of this court.